NOT DESIGNATED FOR PUBLICATION

No. 121,959

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

STEVEN ALLEN HERRON,
*Appellant*.


MEMORANDUM OPINION

Appeal from Riley District Court; MERYL D. WILSON, judge. Opinion filed May 7, 2021. Affirmed.

*Rick Kittel*, of Kansas Appellate Defender Office, for appellant.

*David Lowden*, deputy county attorney, *Barry R. Wilkerson*, county attorney, and *Derek Schmidt*, attorney general, for appellee.


Before GREEN, P.J., MALONE and WARNER, JJ.


PER CURIAM: Before finding him guilty of possessing heroin, interfering with a law enforcement officer, driving on a suspended license, and possessing drug paraphernalia at a bench trial on stipulated facts, the trial court denied Steven Allen Herron's motion to suppress all evidence obtained during his encounter with Troopers Michael Paynter and Jodi Wolf of the Kansas Highway Patrol (KHP) on August 9, 2015. Herron appeals the denial of his suppression motion. He argues that the trial court erred by denying his motion because the troopers violated his rights under the Fourth Amendment to the United States Constitution during this encounter in two ways: First,

1

he contends that Trooper Paynter turned his initially valid public safety stop into an illegal investigatory detention by asking him for identification. Second, he argues that Troopers Paynter and Wolf failed to follow proper impoundment and inventory search procedures when searching his mother's disabled car. Nevertheless, we conclude that because Herron's arguments are not persuasive under the facts of his case, the trial court's judgment denying his suppression motion should be affirmed.

On Sunday, August 9, 2015, at 6:38 p.m., KHP Trooper Michael Paynter noticed a disabled car parked partially on the grass and partially on the westbound shoulder of I-70 near mile marker 319 in Riley County, Kansas. Thus, Trooper Paynter pulled over to check the welfare of the car's driver, who was standing next to the disabled car. As Trooper Paynter parked his patrol car behind the disabled car, he provided dispatch with the disabled car's license plate; dispatch responded that the car belonged to Claudette Cornelius of Kansas City. Trooper Paynter then left his patrol car and started speaking to the driver.

The driver told Trooper Paynter that his front passenger tire had blown out and that he did not have a spare tire. Trooper Paynter asked the driver if he had help coming. The driver told Trooper Paynter that he did have help coming "out of Salina." He then asked Trooper Paynter how far away the nearest rest area was. Trooper Paynter told the driver that the nearest rest area was about 7 miles away. At this point, the driver stated that the rest area would be "more of a designated pick up point" and that he "could get over [in the grass] and try to walk." He added that his mother was calling his brother, and they would bring him a spare tire from Salina.

Trooper Paynter asked the driver how long it would be before help arrived. The driver responded that he did not know because he had just blown the tire minutes before he arrived. Trooper Paynter explained that "the reason why [he was] inquiring" was because he did not want him "to be stranded for a long period of time." The driver replied

2

that he understood why Trooper Paynter was asking him this question. He then started telling Trooper Paynter about his recent car troubles. Once the driver stopped talking, Trooper Paynter double-checked that his plan was to have his mother and brother bring him a spare tire from Salina; the driver confirmed that this was his plan.

At this point, Trooper Paynter, who had noticed that the driver had his cell phone with him, provided the driver with KHP's phone number should he need further assistance. The driver indicated that he would probably be okay because he had "Subaru protection" and it "covered everything." Immediately after saying this, however, the driver and Trooper Paynter had the following exchange:

> "Driver:  "I don't know. I'll stay over here in the grass [inaudible]. I'm sure somebody is going to be nice enough to pick me up. The rest stop would be a focal point.
>
> "Trooper: Well, did you want to go to the rest area?
>
> "Driver: I would appreciate it.
>
> "Trooper: Oh, sure. I can give you a ride there.
>
> "Driver: I really appreciate.
>
> "Trooper: All you had to do was ask. Do you have a driver's license on you?
>
> "Driver: No. I forgot it this weekend. But . . .
>
> "Trooper: Any type of ID?
>
> "Driver: No. I forgot everything. I had to run to Kansas City to a doctor's appointment.
>
> "Trooper: Okay. Are you the registered owner, then?
>
> "Driver: No. My mom is.
>
> "Trooper: Your mom is.
>
> "Driver: My mom is.
>
> "Trooper: Okay. Then, what's your name?
>
> "Driver: Steve Cornelius.
>
> "Trooper: Steve Cornelius.
>
> "Driver: Yes.
>
> "Trooper: And what's your date of birth?
>
> "Driver: 8-26-56."

3

Once the driver gave Trooper Paynter this information, Trooper Paynter returned to his patrol car and asked dispatch to check the KHP computer system for anyone named Steve Cornelius who was born on August 26, 1956. But the dispatch operator told Trooper Paynter that she could not find anyone in their computer system by that name. As a result, Trooper Paynter returned to the driver, who was now on his cell phone.

On finishing his phone call, the driver told Trooper Paynter either that "they" were "on the way" or that "a tow" was "on the way." Trooper Paynter asked the driver what state his driver's license was from. The driver stated that "it was" from Kansas. At this point, Trooper Paynter told the driver that he could not find anybody by his name with a driver's license in Kansas. He thus asked the driver for his name again. The driver said his name was "Steven Allen Cornelius." When telling Trooper Paynter this, the driver spelled out "Steven" and "Allen."

After getting this clarification from the driver, Trooper Paynter returned to his patrol car and asked dispatch to check the KHP computer system for anyone named Steven Allen Cornelius. The dispatch operator responded that she was still unable to find anyone with a Kansas driver's license with that name. Trooper Paynter next asked dispatch if anyone other than Claudette Cornelius owned the car. The dispatch operator responded that Claudette Cornelius was the only registered owner of the car.

After receiving this information from dispatch, Trooper Paynter returned to the driver and told him that he could not find a driver's license for anybody named Steven Allen Cornelius in Kansas. He thus gave the driver a pen and paper. He asked the driver to write his full name to ensure he was spelling it correctly. The driver provided Trooper Paynter with the same name, writing down "Steven Allen Cornelius." After seeing that the driver had provided the same information, Trooper Paynter asked the driver if he ever

4

had a driver's license through a different state. The driver stated that he previously had a driver's license from Iowa.

After learning this, Trooper Paynter returned to his patrol car and asked dispatch to search the KHP computer system for anyone with the name of Steven Allen Cornelius who had ever had a driver's license from Iowa. The dispatch operator responded that she could still find no one with that name.

As a result, Trooper Paynter returned to the driver. As Trooper Paynter approached the driver, the driver told Trooper Paynter that he would wait as long as it took his help "*to get to Kansas*." Trooper Paynter responded to this comment by telling the driver that he could not find any record of him in the KHP computer system. He then explicitly asked the driver if he had a valid driver's license. The driver stated that he did have a valid driver's license from Kansas, that the information he had previously provided was correct, and that he owned the car with his mother.

At this point, Trooper Paynter asked the driver if he had any papers from the doctor's appointment that he was returning from that would have his name on it. The driver indicated that he had some "appointment papers" in the disabled car. Thus, both the driver and Trooper Paynter walked to the disabled car. Within seconds of returning to the disabled car, however, the driver said that he did not know where he had put his doctor's appointment papers. Trooper Paynter then asked if the driver had any documents related to the car, like insurance or registration information, that would have his name on it. After digging through the disabled car's glovebox, the driver gave Trooper Paynter some documents indicating that the car was bought at "Advanced Chevrolet." But those documents did not have the driver's name on it.

Eventually, after directing the driver to keep looking for his doctor's appointment paperwork, Trooper Paynter returned to his patrol car. Once inside his patrol car, Trooper

Paynter asked dispatch to call the phone number that Claudette Cornelius had listed on the disabled car's registration. But shortly after making this request, the dispatch operator responded that the phone number listed on the disabled car's registration was disconnected.

Trooper Paynter returned to the driver again. At this point, the driver had found the disabled car's registration information. In turn, Trooper Paynter reviewed the disabled car's registration information. In doing so, he noted that the driver's mother's name, Claudette Cornelius, was on the car's registration but the name Steven Allen Cornelius was not on the car's registration. The driver responded that even though his name was not on the registration, he co-owned the car because he helped his mother with the car payments. On saying this, Trooper Paynter confronted the driver. He explained that he had "pulled up every Steve Cornelius in the state, and none of them [were the driver]." The driver "promised" Trooper Paynter that he had a valid driver's license from Kansas. He told Trooper Paynter that he did not have anything in the car with his name on it because "he does not carry shit like that" and because he "tried to keep the car half-ass clean." He further told Trooper Paynter that he had called his mother, who was coming from Salina and *may* be bringing his brother along.

At this juncture, Trooper Paynter told the driver that "[they had] a problem because [he could not] find a driver's license for [him]." The driver responded that he "understood." Trooper Paynter then explicitly confronted the driver about whether he had a valid driver's license:

> "Trooper: Be straight with me.
> "Driver: I am straight with you.
> "Trooper: Is Steve not your name?
> "Driver: Yes.
> "Trooper: It's not your name?
> "Driver: Yes. It's Steve. *It's Steven Allen Herron*.

"Trooper: Steven Allen, what?

"Driver: Steven Allen Cornelius!

"Trooper: Okay.

"Driver: See, well, okay. But, uh, no, see we got the car, she got the car. And I help her pay for it by working, you know? By helping her . . . . I understand where you're coming from.

"Trooper: The problem is, I can't find any identification for you. I can't find any driver's license for you.

"Driver: I'm thinking if I had anything [in the car], but I don't. Because I went up to pay my bill. And I didn't have ID to pay my bill. And I was like oh shit. So, I stayed in Kansas City for the weekend. And came down today. I mean, I'm sorry. I don't know what to say. I mean. I don't get caught like this. I usually stay with my mom all the time. I mean, [she is] 80. We both kind of retired down here.

"Trooper: Does your mom have a phone number?

"Driver: What?

"Trooper: Does your mom have a phone number?

"Driver: *She* [*does not*] *have one. They had to get over to my brother.* I don't know where he is at now. I've been trying to get ahold of him. He called from the landline. [Inaudible.] . . . . I'm trying to think, guys.

"Trooper: Okay, sir. I have to find a driver's license for you, and I can't find one. Okay. *And I will tell you, I've never had it where somebody has legitimately had a driver's license and it never showed up in the computer.*

"Driver: Steve Cornelius.

"Trooper: It's a Kansas driver's license. Why is not on the computer then? There's no record of you even having one.

"Driver: Uh, I had one in Iowa, too.

"Trooper: We checked Iowa.

"Driver: I'm sorry. I have no idea." (Emphases added.)

After having the preceding conversation, Trooper Paynter returned to his patrol car and continued to work with dispatch to identify the driver. Dispatch was still unable to find a record of Steven Allen Cornelius. Trooper Paynter thus remained in his patrol car until Trooper Jodi Wolf arrived on scene. On her arrival, Trooper Paynter left his patrol

car, at which point the driver told Trooper Paynter that "Subaru Tow" was coming "right now." When Trooper Paynter asked from what town "Subaru Tow" was coming, the driver responded that it was coming from "[w]hatever [was] the closest town." He then added: "Road runner service is what they have in Kansas City. It would be whatever tow service."

At this point, the driver received a call on his cell phone and walked back over towards the disabled car. The driver remained on his cell phone for about 20 minutes. And when the driver next spoke to the troopers, he had an envelope in his hand. During the conversation that ensued, Trooper Wolf asked the driver if the envelope was addressed to him. The driver stated that the envelope was not addressed to him and instead addressed to his mother. When the troopers pointed out that the envelope seemed to be addressed to a man named "Steven Herron," who had the same address as the address listed on his mother's car's registration, the driver again denied that "Steven Herron" was his name. At first, the driver asserted he "had no idea" who Steven Herron was. A few seconds later, though, the driver told the troopers that he had just remembered that Steven Herron was a man who had used to live downstairs from his mother.

After the driver told the troopers this, Trooper Paynter returned to his patrol car yet again. Once there, he searched the KHP computer system within his patrol car for the name Steven Herron. This search revealed that there was a man named "Steven Allen Herron," born on August 26, 1956, who had previously had a Kansas driver's license and looked similar to the driver. Trooper Paynter gave this information to dispatch for further investigation. About two minutes later, the dispatch operator responded that "Steven Allen Herron" had a suspended Kansas driver's license.

On learning this information, Trooper Paynter returned to the driver, telling him: "I got a Steve Herron, he looks exactly like you, has the same date of birth as you, and the same address as your mom. Now, I want you to tell me right now, is that not you?" At

8

this point, the driver admitted that he was Steven Allen Herron. He told Trooper Paynter that he had lied about his name because he believed that he may have a warrant. At the same time, he alleged that he did not realize he was causing a problem because he started using the last name Cornelius, which was his mother's last name upon her remarriage, many years ago. He alleged that he never uses the last name Herron anymore. Once Herron admitted to the preceding indiscretion, Trooper Paynter arrested Herron for interference with a law enforcement officer and directed Herron to sit in his patrol car.

After Trooper Paynter placed Herron under arrest, he told Herron that the KHP was going to have his mother's disabled car towed. He explained that Trooper Wolf was going to have to stay with his mother's disabled car until then. But Herron countered that he already had a tow coming. As a result, Trooper Paynter once again asked Herron from what town the tow service was coming. And he also asked Herron for the tow service's phone number. Outside of alleging that a tow was coming "from the nearest township," Herron had no answers to Trooper Paynter's questions. When Trooper Paynter warned Herron that the tow truck had to be there "in a timely manner" or else KHP would tow it, Herron simply responded that when he previously had car troubles, it had taken about 30 to 45 minutes for a tow truck to arrive.

Immediately after Herron stated the preceding, Trooper Wolf entered the conversation. She stated that "we're going to call it in." She then explained to Herron that he "could call [the tow company] and answer them but . . . ." Trooper Paynter followed Trooper Wolf's comment by telling Herron that "if he needed to call [the tow], he could go ahead." Trooper Paynter therefore allowed Herron access to his cell phone even though he was already under arrest. After saying this, the troopers told Herron they had to do an inventory search of the disabled car. Also, when Trooper Wolf asked Herron if there was going to be anything illegal in the car, Herron stated that there "shouldn't be" anything illegal in the car.

9

Yet, within seconds of starting the inventory search, Troopers Paynter and Wolf found a purple Crown Royal bag containing numerous syringes and an unknown black substance. When Trooper Paynter returned to his patrol car, he *Mirandized* Herron and confronted Herron with this information. Herron initially claimed to have no knowledge of the purple Crown Royal bag. Seconds later, however, Herron stated that the items must have belonged to a friend who he had recently given a car ride. He alleged that this friend was addicted to drugs.

At this point, Trooper Paynter returned to Herron's mother's disabled car, where he and Trooper Wolf continued their search of the car. By the end of their search, the troopers had found 66 syringes, 1 plastic baggie containing a black substance, 4 metal cups containing black residue, and multiple prescription bottles with the name "Steven Allen Herron" on them. Later testing confirmed that the black substance in the plastic baggie and the black residue on the metal cups was heroin.

Nevertheless, as the troopers continued the process of searching the disabled car, Herron, who remained sitting alone in Trooper Paynter's patrol car, placed a phone call to a tow company. During this phone call, Herron told the tow company where the disabled car was currently located, where he wanted the disabled car towed to, why he needed the disabled car towed, that is, that the front passenger tire was flat and he did not have a spare tire, as well as the disabled car's make and model. When Trooper Paynter returned to his patrol car after Herron placed this call, Herron told him that Jodie's Tow Service or Joey's Tow Service was on its way. Trooper Paynter simply responded that he was unfamiliar with either a Jodie's Tow Service or Joey's Tow Service.

It seems because Trooper Paynter told Herron that he was unfamiliar with either a Jodie's Tow Service or Joey's Tow Service, as soon as Trooper Paynter exited his patrol car again, Herron called back the tow service that he had just been speaking to. During this second phone call, Herron asked the tow service what it was called and how long it

10

would take for a tow truck to arrive at his location. When Trooper Paynter returned to his patrol car just a few seconds after Herron ended this second phone call, Herron told Trooper Paynter that "John's Wrecker" said it would take 30 to 40 minutes for a tow truck to arrive. He then stated that the tow truck should be there sooner since he had called them earlier. Seconds after Herron made this statement, the dispatch operator contacted Trooper Paynter, telling him that John's Wrecker had just called to ask about a car that needed towing near mile marker 319 on I-70.

In the end, Trooper Paynter started driving Herron to the local jail about 96 minutes after he initially stopped to check on Herron's welfare. John's Wrecker had still not arrived to tow Herron's mother's disabled car when Trooper Paynter started driving Herron to the local jail.

The State relied on the preceding events to charge Herron with possessing heroin, interfering with a law enforcement officer, driving with a suspended license, and possessing drug paraphernalia. After the State filed its charges, Herron moved to suppress all evidence Troopers Paynter and Wolf discovered during their August 9, 2015 encounter with him. In his motion, Herron first argued that the trial court should suppress all the evidence the troopers discovered because Trooper Paynter had violated his Fourth Amendment rights by "demand[ing] identification" from him. According to Herron, when Trooper Paynter "could not find [his] name," the stop turned from a valid public safety stop to an illegal investigatory detention. Alternatively, Herron argued that the trial court should at the very least suppress the evidence found during the troopers' search of his mother's disabled car because the troopers never actually impounded his car, rendering the troopers' search illegal and otherwise unreasonable.

When the trial court held an evidentiary hearing on Herron's motion to suppress, the only person who testified at this hearing was Trooper Paynter. Trooper Paynter first testified about his experience as a KHP trooper, noting that he had been a KHP trooper

11

for about 15 years. He then testified about his interaction with Herron on the evening of August 9, 2015. Trooper Paynter explained that he asked Herron for identification because Herron wanted a ride to the nearest rest area. He testified that although he did not initially suspect that Herron was committing a crime, once he was unable to find "his name or driver's license," his suspicion "began to grow." As for the search of the disabled car, Trooper Paynter testified that he and Trooper Wolf conducted an inventory search of the disabled car because it was being towed at his direction. He explained that the inventory search did not last long because Trooper Wolf discovered the "contraband" within a minute of starting that search. Trooper Paynter asserted that once they found the contraband, they completed the search of the car under the "*Carroll* doctrine."

Although Trooper Paynter agreed (1) that Herron had initially called John's Wrecker and (2) that John's Wrecker was the company that finally removed Herron's mother's disabled car, he asserted that the tow was still at his direction under KHP policies. He explained that although Herron had told him that he had called for a tow, he did not believe Herron when he said this for two reasons:  (1) because he was unfamiliar with either "Road Runner Tow Services" or "Joey's Tow Service," which were the two tow companies he could remember Herron initially referencing; and (2) because he had spent "the previous hour" lying to him about his name. He then relied on the KHP "Vehicle Tow/Inventory" policy, which stated that troopers may conduct an inventory search whenever a vehicle is being towed at their direction and "[t]he person driving or in control of such vehicle is arrested and taken into custody and the vehicle is not validly parked." He alleged that he could impound and then search Herron's mother's disabled car because he had arrested Herron and because Herron's mother's disabled car was not validly parked as it was on the Interstate.

After Trooper Paynter finished testifying, the State asked the trial court to deny Herron's motion to suppress, arguing that Troopers Paynter and Wolf acted within Herron's Fourth Amendment rights by asking for identification and by searching the car.

12

Herron countered the State's argument by repeating the arguments in his previously filed suppression motion. But the trial court rejected Herron's arguments from the bench.

The trial court first found that as Trooper Paynter was conducting a valid public safety stop, "a discussion took place about giving [Herron] a ride." It found that this discussion ended after Trooper Paynter "indicated [that] he could" take Herron to the rest area 7 miles away, at which point Trooper Paynter asked Herron for identification. It found that although Herron "had no legal duty" to provide his name, Trooper Paynter had the "right to know the name of the person [who] he [was] going to be transporting" for his own safety. Also, it found that Trooper Paynter also had the right to ask dispatch to search the names Herron gave to ensure there were not "any issues" with Herron before transporting him in the patrol car. Based on these findings, the trial court concluded that after Trooper Paynter learned from dispatch that the KHP computer system had no information about anybody by the name "Steve Cornelius," "any reasonable police officer or trooper would have reasonable suspicion that something was going on" as this indicated Herron was hiding some criminal behavior.

Regarding the search of Herron's mother's disabled car, the trial court found that Trooper Paynter reasonably believed that Herron was lying about having already called a tow because over the course of their encounter, Herron had repeatedly lied about his name, had no identification, and had only mentioned tow services that Trooper Paynter was unfamiliar with. It found that once Trooper Paynter had arrested Herron for interference with a law enforcement officer, Trooper Paynter "had control of the vehicle" and its disposition. It found that although Herron mentioned a tow service that Trooper Paynter was familiar with, that is, John's Wrecker, Herron did not mention this tow service until after his arrest and after the troopers had already started their inventory search. It noted that Trooper Paynter testified that the disabled car was illegally parked and that there was no evidence that the troopers conducted the inventory search in bad faith. Thus, it found that "[r]egardless of who called the tow company, the troopers had

13

the right to either allow that company to tow it or deny that tow company the right to remove it." In turn, it concluded that under the preceding facts as well as the KHP Vehicle/Tow Inventory policy, the troopers' search of the disabled car was legal.

Once the trial court denied his motion to suppress, the State and Herron reached an agreement on stipulated facts under which Herron had a continuing objection to the denial of his suppression motion. At his bench trial on these stipulated facts, the trial court found Herron guilty on all counts. It then sentenced Herron to an underlying term of 17 months' imprisonment, to a controlling term of 12 months' probation, followed by 12 months' postrelease supervision.

Herron timely appealed the denial of his suppression motion to us.

*Did the Trial Court Err by Denying Herron's Motion to Suppress?*

On appeal, Herron continues to argue that Trooper Paynter violated his Fourth Amendment rights by exceeding the scope of his initially valid public safety stop by asking him to identify himself. He also continues to argue that Troopers Paynter and Wolf's inventory search was illegal and otherwise unreasonable under the KHP Vehicle Tow/Inventory policy. So Herron contends that we should reverse his convictions, reverse the trial court's denial of his suppression motion, and remand to the trial court with directions to suppress all evidence obtained from the violation of his Fourth Amendment rights.

The State counters we should affirm the trial court's denial of Herron's suppression motion because none of Herron's arguments have merit. It asserts that Trooper Paynter did not exceed the scope of his initially valid public safety stop because Trooper Paynter asked Herron only for identification after Herron had "accepted [Trooper Paynter's] offer for a ride to the rest area." In making this argument, the State stresses that as Trooper

14

Paynter tried to identify Herron, Herron was not seized. Instead, he was "moving freely about and making phone calls." Also, the State counters Herron's contention that the search of his mother's disabled car was illegal by maintaining that Troopers Paynter and Wolf search complied with the KHP's Vehicle Tow/Inventory policy. Alternatively, the State argues that we should affirm the trial court's denial of Herron's suppression motion because any unlawful conduct by the troopers was sufficiently attenuated from the discovery of the contraband in Herron's mother's disabled car.

*Applicable Law*

The Fourth Amendment provides people with the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." In *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961), the United States Supreme Court held that a person's rights under the Fourth Amendment are enforceable against the states under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

So far, "Kansas courts have recognized four types of police-citizen encounters: (1) voluntary encounters, (2) investigatory detentions, (3) public safety stops, and (4) arrests." *State v. McKenna*, 57 Kan. App. 2d 731, 734, 459 P.3d 1274 (2020). As indicated by the four separate categories of police-citizen encounters, "[a] public safety stop is *not* for investigative purposes." *State v. Gonzales*, 36 Kan. App. 2d 446, Syl. ¶ 4, 141 P.3d 501 (2006). Thus, a law enforcement officer violates a person's Fourth Amendment rights if the officer's public safety stop is actually a pretext to investigate that person for a crime. In turn, the legality of a public safety stop can be evaluated under the following three steps:

> "First, as long as there are objective, specific, and articulable facts from which an
> experienced officer would suspect that a citizen is in need of help or is in peril, then that

15

officer has the right to stop and investigate. Second, if the citizen is in need of aid, then the officer may take appropriate action to render assistance or mitigate the peril. Third, once, however, the officer is assured that the citizen is not in peril or is no longer in need of assistance or that the peril has been mitigated, then any actions beyond that constitute a seizure implicating the protections provided by the Fourth Amendment to the United States Constitution." 36 Kan. App. 2d 446, Syl. ¶ 3.

Still, a valid public safety stop may turn into a valid investigatory detention if a law enforcement officer acquires a reasonable and articulable suspicion that the person in need of help has committed a crime, is about to commit a crime, or is actively committing a crime. See *State v. Ellis*, 311 Kan. 925, 942, 469 P.3d 65 (2020) (holding that a public safety stop may turn into an investigatory detention if an officer develops reasonable suspicion of criminal conduct while completing the public safety stop); *Nickelson v. Kansas Dept. of Revenue*, 33 Kan. App. 2d 359, 367, 102 P.3d 490 (2004) (holding that the officer did not impermissibly expand the scope of a valid public safety stop by investigating Nickelson for driving under the influence because the obvious odor of alcohol coming from Nickelson's person provided the officer reasonable suspicion to investigate Nickelson for driving under the influence). "Determining what is reasonable is based on the totality of the circumstances and is viewed in terms as understood by those versed in the field of law enforcement." *State v. Hanke*, 307 Kan. 828, Syl. ¶ 3, 415 P.3d 966 (2018). Also, a law enforcement officer need only have a minimum level of objective justification of the person's potential criminal activity to acquire a reasonable and articulable suspicion. 307 Kan. at 828.

As for impoundment of a person's car following arrest, our Supreme Court has explicitly held that Kansas caselaw "does not create a Fourth Amendment right to a police consultation regarding the disposition of the vehicle before impound may be lawful." *State v. Shelton*, 278 Kan. 287, 296, 93 P.3d 1200 (2004). Instead, our Supreme Court has explained: "What is required under the Fourth Amendment is that the impoundment be reasonable under the totality of circumstances. The officer's inquiry of

the driver regarding disposition is but one of the circumstances that is considered in the court's determination of whether the impoundment is reasonable." 278 Kan. at 293. Thus, even "[i]f the police do not have express authority to impound a vehicle, they may still take lawful custody of a vehicle when there are 'reasonable grounds' for impoundment." *State v. Teeter*, 249 Kan. 548, 550-51, 819 P.2d 651 (1991). Alternatively, law enforcement may impound a vehicle and then conduct an inventory search of a vehicle when authorized by statute. 249 Kan. at 550.

Meanwhile, "[i]nventory searches are recognized as exceptions to the probable cause warrant requirements of the Fourth Amendment." *Shelton*, 278 Kan. at 292-93. And it is a well-known rule that "inventory searches conducted pursuant to standard police procedures are reasonable." 278 Kan. at 299 (citing *South Dakota v. Opperman*, 428 U.S. 364, 372, 96 S. Ct. 3092, 49 L. Ed. 2d 1000 [1976]).

Lastly, when considering the trial court's denial of a suppression motion, we apply a bifurcated standard of review: Under the first step of our review, we must consider if the trial court's fact-findings are supported by substantial competent evidence. *Hanke*, 307 Kan. at 827. "Substantial competent evidence" is evidence that "possesses both relevance and substance and which furnishes a substantial basis in fact from which the issues can reasonably be resolved." *State v. Sharp*, 289 Kan. 72, 88, 210 P.3d 590 (2009). Also, when considering the trial court's fact-findings for substantial competent evidence, we must not reweigh the evidence or reassess the credibility of witnesses. *Hanke*, 307 Kan. at 827. On the other hand, under the second step of our review, we consider the validity of the trial court's ultimate legal conclusion while exercising de novo review. 307 Kan. at 827.

*Public Safety Stop*

Herron specifically argues that Trooper Paynter exceeded the scope of his initially valid public safety stop because Trooper Paynter asked him to identify himself without "any suspicion of criminal activity." Although Herron concedes that Trooper Paynter could offer him a ride to the rest area as part of his public safety stop, Herron contends that after he told Trooper Paynter that "he had contacted a tow company and that his brother was coming to pick him up," "a reasonable officer would have known that [he did] not need any further assistance."

In making this argument, Herron stresses that that it was Trooper Paynter who offered him a ride to the nearest rest area. He also relies heavily on our decision in *State v. Messner*, 55 Kan. App. 2d 630, 419 P.3d 642 (2018). Herron contends that his case is similar to *Messner* because like the officer in *Messner*, Trooper Paynter "exceeded his authority when he requested identification and kept [him] at the scene over an hour conducting a criminal investigation."

But there are some obvious problems with Herron's arguments. For starters, although it was Trooper Paynter who asked Herron if he "want[ed] to go to the rest area," Herron had plainly indicated that he wanted a ride to the rest area. Indeed, immediately before Trooper Paynter asked Herron if he "want[ed] to go to the rest area," Herron had told Trooper Paynter that he was "sure somebody [was] going to be nice enough to pick him up." He then continued by telling Trooper Paynter that "[t]he rest stop would be a focal point."

Also, as evidenced in Trooper Paynter's dashcam video, the tone of Herron's voice while making the preceding comments establishes that he wanted something from Trooper Paynter. That is, his intonation while telling Trooper Paynter that he was "sure somebody [was] going to be nice enough to pick him up" indicated that he would assume

18

somebody nice was going to pick him up and drive him to the nearest rest area unless Trooper Paynter told him something to the contrary. In short, Herron's comments about wanting to go to the rest area coupled with his intonation establishes that even if Herron did not directly ask Trooper Paynter for a ride, he was nonetheless seeking a ride from Trooper Paynter.

Next, even if we were to ignore that Herron effectively asked Trooper Paynter for a ride to the rest area, Herron's argument shows an unwillingness to acknowledge that his comments sufficiently established that he needed further assistance from Trooper Paynter. Despite Herron's assertion to the contrary, Herron had not told Trooper Paynter that he had contacted a tow company before Trooper Paynter asked him if he wanted a ride to the nearest rest area. Trooper Paynter's dashcam video establishes that Herron never mentioned a tow truck before Trooper Paynter asked him if he wanted a ride. Instead, the first time Herron referenced a tow truck was after Trooper Paynter had asked Herron to identify himself *and* after the dispatch operator had told Trooper Paynter that she could find no information in the KHP computer system on anybody named "Steve Cornelius."

Thus, before Trooper Paynter asked for identification, the only information Trooper Paynter had about Herron's incoming help was that his mother and brother, who were driving out of Salina, would bring him a spare tire. On top of this, by the time Trooper Paynter asked Herron if he "want[ed] to go to the rest area," Herron had twice indicated that the rest area would be a good place for him to wait for help. And he had told Trooper Paynter (1) that he "could get over [in the grass] and try to walk" and (2) that he was "sure somebody [was] going to be nice enough to pick him up" and drive him to the rest area. Clearly, although Herron argues otherwise, his comments to Trooper Paynter implied that he was unhappy with his current location, that he wanted to get to the rest area, and that he was willing to walk along the Interstate or hitchhike to get there.

19

It would be absurd to say that walking along the Interstate for 7 miles or hitchhiking are safe activities. Because an officer conducting a public safety stop has the right to stop and investigate as long as objective, specific, and articulable facts indicate that a person is still in need of help or is in peril, Herron's comments about his willingness to walk or hitchhike to the nearest rest area furnished Trooper Paynter with a legitimate reason to ask Herron if he wanted a ride. See *Gonzales*, 36 Kan. App. 2d 446, Syl. ¶ 3. Thus, Herron's contention that Trooper Paynter could not ask for his identification because a reasonable officer would have realized that he was no longer in need of assistance is entirely absurd.

Notwithstanding the preceding problems, Herron's arguments that *Messner* establishes that Trooper Paynter exceeded the scope of his initially valid public safety stop by asking him for identification is unpersuasive. Herron relies on *Messner* because it involves an officer's request for identification. Yet, in *Messner*, we did not hold that a law enforcement officer exceeds the scope of an otherwise valid public safety stop by asking for identification. Instead, it held that even if the officer could ask Messner for identification under the specific facts of his case, the officer "exceeded the scope of the safety stop *by actually seizing Messner's driver's license* and checking for warrants." (Emphasis added.) *Messner*, 55 Kan. App. 2d at 637-38. Here, although Trooper Paynter asked Herron if he had a driver's license on him, he never seized Herron's driver's license because it is undisputed that Herron had no driver's license with him. Thus, Herron's case is factually distinguishable from *Messner*.

More significantly, Herron has ignored other Kansas caselaw that clearly contradicts his arguments. First, our Supreme Court has already held that "an officer's mere request for identification or information about one's identity does not, by itself, constitute a seizure under the Fourth Amendment to the United States Constitution." *State v. Pollman*, 286 Kan. 881, 888, 190 P.3d 234 (2008). Instead, "if a law enforcement officer retains a driver's license, this can be a factor considered in the totality of the

20

circumstances and may, absent offsetting circumstances, mean a reasonable person would not feel free to leave without his or her license." 286 Kan. at 888. Second, in *McKenna*, a recent public safety stop decision by us, we relied on the preceding Kansas Supreme Court precedent to reject McKenna's argument that a law enforcement officer turned an otherwise valid public safety stop into an illegal investigatory detention by asking her for identification and then checking her name through dispatch. 57 Kan. App. 2d at 737.

In *McKenna*, a law enforcement officer on patrol in a residential neighborhood saw a woman sleeping in her car with her driver's side window rolled down and her interior car lights on. The officer stopped and attempted to wake the driver up. Once the driver started to wake up, it became clear to the officer that she may be unwell or intoxicated. After identifying himself, the officer asked the driver for her name. The officer later asserted that he asked the driver for her name because he was concerned about the driver's well-being, believing that she may need a ride home. Then, after the driver responded that she was Tia McKenna, the officer asked dispatch to check McKenna's name. Dispatch responded that McKenna had an outstanding warrant for her arrest; thus, the officer arrested Mckenna. Following her arrest, a different officer found illegal drugs on McKenna's person.

Once the State charged McKenna with drug possession, McKenna filed a motion to suppress. The trial court denied McKenna's motion because it found that the officer's conduct fell within the scope of his community caretaking functions. McKenna appealed this decision to us, arguing that the officer exceeded the scope of his initially valid public safety stop by asking her name and checking for warrants. Nevertheless, we rejected McKenna's argument.

In affirming the trial court, we first pointed to our Supreme Court precedent establishing that an officer's mere request for identification does not, by itself, constitute a seizure for Fourth Amendment to the United States Constitution purposes. 57 Kan.

21

App. 2d at 737 (citing *Pollman*, 286 Kan. at 888). We then noted that previous panels of our court have "repeatedly held that an officer may request identification during a public safety stop." 57 Kan. App. 2d at 737. Based on this precedent, we rejected McKenna's argument that the officer's request for identification constituted a per se violation of her Fourth Amendment rights. It concluded that although officers may not force people to provide identification, they can request identification without exceeding the scope of their community caretaking functions. 57 Kan. App. 2d at 739.

Lastly, we rejected McKenna's argument that the officer's warrants check exceeded the scope of his otherwise valid public safety stop for the following reasons:

"McKenna contends that running a name for wants and warrants is generally inconsistent with a community caretaking function. That may or may not *generally* be true. Generally, an officer gets and keeps some identification papers when checking for warrants. That did not happen here. And asking for and verbally getting a name, given the situation McKenna found herself in, coupled with the facts established by [the officer's] testimony, is not necessarily for investigative purposes. [The officer] testified that his practice in similar situations was to drive the intoxicated person home, and that is what he anticipated doing here. And if he were to drive her home in his car, it is reasonable for him to want to know whether she was wanted for a violent crime and may pose a danger to him. For that matter, doing a quick limited check for warrants while interacting with McKenna was reasonable as a check for potential dangers. [The officer's] act of running a local warrants check, under these circumstances, was directly tied to the public safety concern that instigated the stop." 57 Kan. App. 2d at 738.

Simply put, although there are some factual distinctions between Herron's case and *McKenna*, the key tenets of *McKenna* apply equally to Herron's case. As the trial court found when denying Herron's suppression motion, when Trooper Paynter asked Herron for his name, he could have refused to answer, at which point Trooper Paynter could not legally force Herron to answer. But this is not what happened. Instead, like in *McKenna*, Herron voluntarily provided Trooper Paynter with a name, albeit a fake name. Because

22

an officer may ask a person for identification without violating that person's Fourth Amendment rights, Trooper Paynter's questioning of Herron about his identity was proper. In turn, despite Herron's contention to the contrary, Trooper Paynter could ask him to identify himself without having reasonable suspicion that he had committed a crime.

As for Trooper Herron's decision to ask dispatch to search their computer system for records of anybody named "Steve Cornelius," Herron does not explicitly argue that checking his identity through dispatch constituted a violation of his Fourth Amendment rights. As a result, Herron has abandoned his ability to make this argument on appeal. See *State v. Salary*, 309 Kan. 479, 481, 437 P.3d 953 (2019) (holding that an issue not briefed is deemed waived and abandoned). Still, even if Herron had raised this argument, *McKenna's* precedent establishes that such an argument would fail. Like the officer in *McKenna*, because Trooper Paynter would have to share his patrol car with Herron to drive him to the rest area, it was reasonable for Trooper Paynter to want to know whether Herron was wanted for a violent crime or may pose a danger to him. See 57 Kan. App. 2d at 738.

Finally, Herron's argument does not explicitly address the trial court's finding that once Trooper Paynter and dispatch could not find any records for a person by the name of "Steve Cornelius" in the KHP computer system, Trooper Paynter acquired reasonable suspicion that Herron was committing a crime. As with his other unbriefed argument, by not addressing the trial court's reasonable suspicion finding in his brief, Herron has abandoned his ability to challenge this finding on appeal. See *Salary*, 309 Kan. at 481. All the same, even if Herron had challenged this finding, it is readily apparent that this challenge would fail.

Once again, at the evidentiary hearing, Trooper Paynter testified that although he did not initially suspect that Herron was committing a crime, once he was unable to find

23

"his name or driver's license," his suspicion "began to grow." Also, as shown in his dashcam video, before Trooper Paynter had even arrested Herron, he told Herron that in his nearly 15 years of experience as a KHP trooper, he "never had it where somebody [] legitimately had a driver's license and it never showed up in the computer." Given the preceding evidence, the trial court properly determined that Trooper Paynter acquired a reasonable and articulable suspicion that Herron had engaged in some criminal conduct upon dispatch notifying him that the KHP computer system had no records for anybody named "Steve Cornelius."

To conclude, Herron's arguments why Trooper Paynter exceeded the scope of his otherwise valid public safety stop by asking him to identify himself are unpersuasive. Under the facts of this case, Trooper Paynter's questioning was not inconsistent with his community caretaking functions as his questions were directed at identifying Herron after Herron accepted his offer for a courtesy ride to the nearest rest area. As a result, the trial court properly found that Trooper Paynter had the authority to ask Herron to identify himself without violating Herron's Fourth Amendment rights or exceeding the scope of his otherwise valid public safety stop.

*Search of Disabled Car*

Herron's argument about Troopers Paynter and Wolf's search of the disabled car is similarly unpersuasive. According to Herron, because he initially contacted John's Wrecker and John's Wrecker was the tow service that ultimately towed his mother's disabled car, the car was never impounded by the KHP. Thus, he contends that the troopers never had lawful possession of his mother's disabled car, rendering their search unconstitutional. Alternatively, Herron contends that Troopers Paynter and Wolf lacked reasonable grounds to impound and then search his mother's disabled car because he was capable of disposing of the car himself for two reasons: (1) because he was of "sound mind" and (2) because nothing in the record indicates that Troopers Paynter or Wolf

24

would have been further delayed had he been allowed to control the tow. In making all of his arguments, Herron alleges that "he arranged for [the] car to be towed prior to his arrest," which establishes that "[h]is efforts were not made to avoid impoundment by law enforcement officers."

But Herron's primary argument about Troopers Paynter and Wolf never impounding the disabled car ignores the timing of when he first contacted John's Wrecker. Although Herron alleges that he had contacted John's Wrecker before his arrest, Herron never mentioned John's Wrecker before his arrest. Instead, before his arrest, the only tow service Herron mentioned by name was "Subaru Tow." And he did not mention "Subaru Tow" until Trooper Wolf arrived to assist Trooper Paynter. Then, following his arrest, it was about another 15 minutes before Herron told Trooper Paynter that either a "Jodie's Tow Service" or "Joey's Tow Service" was on its way.

Also, although Trooper Paynter's dashcam video indicates that Herron simply misspoke when he referred to the tow service as "Jodie's" or "Joey's" instead of "John's Wrecker," between his arrest and when he first told Trooper Paynter about this tow service, Troopers Paynter and Wolf had both already told Herron that KHP was going to tow the disabled car. Moreover, even though Troopers Paynter and Wolf allowed Herron to call the tow service that he claimed he had already called following his arrest, they did not tell Herron that he was in control of the tow. To the contrary, after both troopers had told Herron that KHP was going to tow his mother's disabled car, Trooper Paynter told Herron that "*if he needed to call* [*the tow service*], he could go ahead." (Emphasis added.) In other words, Trooper Paynter told Herron that if he believed it necessary to call the tow service, then he could. He did not say that Herron could control the disposition of the car.

Herron's contention that KHP never actually impounded his car is also inconsistent with what ultimately happened to his mother's disabled car. Again, Trooper Paynter

25

started driving Herron to jail before any tow truck arrived to remove his mother's disabled car. Also, although Trooper Paynter's dashcam video establishes that Herron wanted the car towed to his mother's house, John's Wrecker towed the car to its lot. There is no explanation in the record on appeal why the car was towed to John's Wrecker's lot as opposed to Herron's mother's house. The clear takeaway from this fact, however, is that Herron was not in control of the disposition of the car because KHP had impounded it. Thus, Herron's contention that KHP never impounded the car is simply not supported by the record on appeal.

Next, Herron's contention that Troopers Paynter and Wolf otherwise acted unreasonably by impounding and then searching his mother's disabled car ignores both Kansas caselaw as well as the various lies Herron told the troopers during the hour that preceded his arrest.

In his brief, Herron contends that he should have been allowed to dispose of the car himself by pointing to Kansas caselaw indicating that the owner, operator, or person in charge of a car should be allowed to determine the disposition of the car. See *Teeter*, 249 Kan. at 552 ("'If the owner, operator or person in charge of the vehicle is readily available to make a determination as to the disposition of the vehicle then he may do so.'"). But in *Shelton*, our Supreme Court clarified its earlier position about allowing the owner, operator, or person in charge of a car to determine the disposition of the car, explaining as follows:

> "*Perhaps our court has placed too much reliance upon the opportunity of a driver to dispose of the vehicle rather than submit to its impoundment*. However, a careful reading of *Teeter* as well as other decisions by this court on the subject establish that impoundment is lawful if there are 'reasonable grounds' for impoundment. *Those earlier decisions from this court do not create a Fourth Amendment right to a police consultation regarding the disposition of the vehicle before impoundment may be lawful*. Consultation is but one factor, although an important factor to be considered among the

26

*totality of the circumstances in the determination of whether impoundment is reasonable.*" 278 Kan. at 295-96. (Emphases added.)

Based on the preceding holding, it is readily apparent that Herron's complaint about not being able to determine the disposition of the car cannot by itself establish that Troopers Paynter and Wolf's decision to impound the car was unreasonable.

Also, the specific facts of Herron's case establish that Troopers Paynter and Wolf's decision to impound and then search the disabled car was entirely reasonable. For starters, although the State has never relied upon K.S.A. 8-1570(c)(3) to support the troopers' impoundment, it seems the State could have. K.S.A. 8-1570(c)(3) provides that law enforcement officers are

"authorized to remove or caused to be removed to the nearest garage or other place of safety any vehicle found on the highway when . . . the person driving or in control of such vehicle is arrested for an alleged offense for which the officer is required by law to take the person arrested before a judge of the district court without unnecessary delay."

Notwithstanding the fact that K.S.A. 8-1570(c)(3) seemingly provided the troopers with the authority to impound Herron's mother's disabled car, even under our Supreme Court's older precedent, our Supreme Court recognized that law enforcement may reasonably impound a car "'where the person responsible for its possession is unable . . . or unwilling to instruct the arresting officers as to the vehicle's disposition . . . .'" *Teeter*, 249 Kan. at 552. Here, Herron's conduct both before and after his arrest established that he was unable and otherwise unwilling to instruct Troopers Paynter and Wolf as to the disposition of his mother's disabled car.

To begin with, it is undisputed that Herron concealed his true identity for over an hour after "promis[ing]" Trooper Paynter that he was neither lying about his identity nor

27

lying about having a valid Kansas driver's license. Indeed, even after his arrest, Herron continued to lie about why he had given Trooper Paynter the name "Steven Allen Cornelius." He alleged that telling Trooper Paynter "Steven Allen Herron" never crossed his mind because he had not used the last name Herron for years. Plainly, however, this was not true. Although Trooper Paynter did not hear him clearly, at one point during Trooper Paynter's questioning of Herron, Herron slipped up and said that his name was "Steven Allen Herron." If it had truly never crossed Herron's mind to tell Trooper Paynter that his name was Steven Allen Herron, then Herron would not have made this gaffe.

But this was not the only thing Herron evidently lied to Trooper Paynter about during their encounter. During their encounter, Herron also volunteered the following inconsistent information to Trooper Paynter before his arrest:

- At first, Herron told Trooper Paynter that his mother and brother would bring him a spare tire. Later, he stated he was unsure if his mother would pick up his brother.
- At first, Herron told Trooper Paynter that his mother and brother were driving from Salina, Kansas. Later, he implied that his family was coming from out of state to help him with the disabled car.
- At first, Herron told Trooper Paynter that he had called his mother. Later, Herron told Trooper Paynter that his mother did not have a phone.
- At first, Herron implied that only his mother owned the car. Later, he alleged that they both owned the car.
- At first, Herron stated that he had doctor's appointment papers with his name on it in the car. As soon as Trooper Paynter asked Herron to produce these papers, he claimed he did not know where they were located.

28

In short, Herron's attempt to hide his true identity, as well as his numerous inconsistent statements, supports Trooper Paynter's testimony about distrusting Herron. And in turn, Herron's various lies before his arrest supports Trooper Paynter and Trooper Wolf's decision to impound Herron's mother's disabled car because they did not believe that Herron had actually already called a tow.

Yet, even if we were to ignore the preceding lies, Herron continued to make misleading statements to Troopers Paynter and Wolf following his arrest. For instance, the only tow service Herron had mentioned by name before his arrest was "Subaru Tow." And during the entire encounter with Troopers Paynter and Wolf, he mentioned "Subaru Tow" just once. The next reference to any tow service occurred shortly after his arrest. At that point, right after Trooper Paynter told Herron that KHP would be towing the disabled car, Herron told Trooper Paynter that he already contacted a tow. But when Trooper Paynter asked Herron from what town the tow truck would be coming and for the tow service's phone number, Herron could not answer Trooper Paynter's questions.

One would assume that if Herron had very recently used his cell phone to call "Subaru Tow," he could have easily provided Trooper Paynter with this information when asked. Even on appeal, Herron provides no explanation about what happened to the tow from "Subaru Tow," which he had allegedly called nearly 30 minutes before his arrest. Although Trooper Paynter never mentioned Herron's reference to "Subaru Tow" while testifying, he did testify that he did not believe Herron about having already called for a tow because, in addition to Herron's lies about his identity, the tow services Herron had mentioned were unfamiliar to him.

In a nutshell, the fact that Herron claimed to have called "Subaru Tow" yet has never provided an explanation why "Subaru Tow" did not respond to his request for a tow supports that Trooper Paynter's suspicion about Herron not having called a tow was justified. And it further undermines Herron's contention that Troopers Paynter and Wolf

29

should have allowed him to determine the disposition of the disabled car because he was "of sound mind" and because allowing him to do so would have caused no further delay. Clearly, throughout their encounter, Herron repeatedly obstructed with Troopers Paynter and Wolf as they tried to complete their duties. Indeed, this is why he was convicted for interference with a law enforcement officer.

Finally, Troopers Paynter and Wolf's decision to impound and then search the disabled car was consistent with the KHP Vehicle Tow/Inventory policy. KHP's Vehicle Tow/Inventory policy states that it applies "any time a vehicle is towed, transported or otherwise removed as an arrest authorized by K.S.A. 22-2401." Of note, K.S.A. 22-2401(c)(1) states that a law enforcement officer may arrest a person if the officer has probable cause that the person committed a felony. Thus, in effect, the KHP Vehicle Tow/Inventory policy states that it applies any time a vehicle is towed, transported, or otherwise removed after an officer arrests the vehicle's driver because there is probable cause that the driver has committed a felony. It goes on to list several instances that are deemed lawful tows and searches. Section III.A.4 of the policy states that officers may impound and then search a vehicle when there is "[a]n arrested driver who is unable to or unwilling to instruct the officer as to the vehicle's disposition." And Section III.A.3 of the policy states that officers may impound and then search a vehicle when "[t]he person driving or in control of such vehicle is arrested and taken into custody and the vehicle is not lawfully parked." At the evidentiary hearing, Trooper Paynter explicitly testified that he relied on Section III.A.3 to impound and then search the disabled car.

Although Trooper Paynter did not explicitly testify that he relied on the KHP Vehicle Tow/Inventory policy provision about impounding and searching a vehicle when the arrested driver is unable to or unwilling to instruct the officer as the vehicle's disposition, he could have relied on this provision to impound and search the disabled car. Also, it is readily apparent that Trooper Paynter properly invoked Section III.A.3 of the policy to impound and then search Herron's mother's disabled car. Again, it is

30

undisputed that Herron was under arrest for interfering with a law enforcement officer, which is a severity level 9 nonperson felony. See K.S.A. 2020 Supp. 21-5904(a)(3), (b)(5)(A). Additionally, Herron has not disputed Trooper Paynter's testimony that the manner in which Herron parked his mother's disabled car on I-70's shoulder was illegal. See also K.S.A. 8-1571(a)(1)(ix) (stating that "no person shall . . . park a vehicle . . . [o]n any controlled-access highway").

Thus, to summarize, the record does not support Herron's contention that Troopers Paynter and Wolf never impounded his mother's disabled car and could therefore not legally search his mother's disabled car. Nor does the record support Herron's contention that the troopers otherwise lacked reasonable grounds to impound and then search his mother's disabled car. Instead, given Herron's repeated lies and inconsistent statements both before and after his arrest, the troopers reasonably decided to impound the car and conduct an inventory search. Their decision was consistent with our statutes, our Supreme Court's holdings, as well as KHP's Vehicle Tow/Inventory policy. So we conclude that the trial court's denial of Herron's suppression motion should be affirmed. Because we are affirming, it is not necessary for us to consider the State's alternative argument about the attenuation doctrine.

Affirmed.